U.S. COURTS

MAY 2 9 2024

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

Rosa Maria Leyva
2743 W. Peak Cloud Lane A206
Meridian, Idaho 83642
208-860-0557
*Pro se plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSA MARIA LEYVA, an individual; and DOES I-X, unidentified individuals,<br><br>    Plaintiffs,<br><br>v.<br><br>THE UNIVERSITY OF IDAHO, a public University governed by the BOARD OF REGENTS OF THE UNIVERSITY OF IDAHO aka the STATE BOARD OF EDUCATION, an executive department of the STATE OF IDAHO,<br><br>    Defendant. | Case No. 1:24-CV-00263-DCN<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Rosa Maria Leyva ("Plaintiff" or "Leyva") complains against the University of

Idaho ("Defendant" or "University") as follows:

## NATURE OF ACTION

1.      This is a lawsuit against the University for discrimination against Rosa Leyva, a

former student of the University of Idaho College of Law ("Law School"), for discrimination

based on her sex, race, national origin, and color.

2.      Leyva was the first Latina president of the Women's Law Caucus. In 2023, Leyva

administered the election of officers following the practices and rules followed by her white

predecessors. For probably the first time in the history of the Idaho Women's Law Caucus,

students—white students—challenged the process Leyva followed. White students, in collaboration with white advisors, successfully overturned the first WLC election administered by a Latina, even though Leyva had administered the election in the same manner as her white female predecessors.

3.     On information and belief, these students challenged the election outcome solely because of discriminatory animus toward Plaintiff. The University, through actions of the Law School's deans and other faculty, upheld the complaint even though Leyva followed the same procedure that had always been used.

4.     Leyva was also a student in the Law School's Housing Clinic during the spring 2023 semester. She experienced discrimination in the clinic where the clinic supervisor treated her differently, and unfavorably, compared to her white male colleagues.

5.     Leyva seeks compensation for the harm and damages caused by the University's discriminatory actions. Because of those actions and the University's failure to support Leyva, she was isolated and ostracized while still a student; her mental health rapidly declined and she has continued to suffer emotional distress—including outrage, shock, and humiliation—as well as physical distress, and to struggle with mental health complications since; she has suffered and continues to suffer reputational harm; and she has economic damages and lost opportunities, including employment and professional opportunities, and continues to lose such opportunities and endure economic damage.

## PARTIES, JURISDICTION, AND VENUE

6.     Plaintiff Rosa Maria Leyva is a Hispanic female currently residing and domiciled in Idaho. Leyva is a graduate of the Idaho College of Law. She was a third-year law student during the events at issue.

7.      Plaintiffs DOES I-X are individuals who, on information and belief, experienced the same or similar conduct at the University as that experienced by Leyva but whose identities are currently unknown.

8.      Defendant The University of Idaho is an accredited university with campuses in Moscow and Boise, Idaho. The University of Idaho is a corporate and political body organized and existing under the laws of the state of Idaho. At all relevant times, the University of Idaho was operating an educational program or activity receiving federal financial assistance, bringing it under the requirements of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. and Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.

9.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 (federal claims), §§ 2201 and 2202 (declaratory relief), and § 1367(b) (supplemental jurisdiction over state claims)

10.     Venue is proper with this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## GENERAL ALLEGATIONS

### *WLC Election*

11.     In the Spring of 2023, Leyva was a third-year law student at the University of Idaho College of Law and the first Latina to serve as president of the Women's Law Caucus ("WLC"). The WLC is a student organization, supported by the University, that states its purpose as follows:

> Promote an atmosphere of equality among all law students; Raise awareness of the legal issues impacting women; Promote networking opportunities among our members, the faculty and staff, and the legal community at large; Provide acts of service for the community; Outreach to underrepresented groups in the law; Encourage the development, recognition, and discussion of women's contributions to the legal field.

12.     The WLC Constitution sets forth the procedure for holding elections for WLC officers. The president's responsibilities include administration of the election process by "sending out emails, preparing flyers, and tallying votes."

13.     In the spring of 2023, Plaintiff administered the election of WLC officers for the 2023-2024 school year. Plaintiff followed the procedure that had been taught to her by prior WLC officers and that she understood was consistent with the WLC Constitution.

14.     Consistently with the historical practice of WLC elections, all votes submitted were counted regardless of whether the voter was a "member" of WLC (even though WLC did not officially have members or any particular membership criteria) or whether the voter had come to a WLC meeting or participated in WLC events.

15.     When the election was completed, Plaintiff counted the votes and announced the new officers for 2023-2024.

16.     On or about April 18, 2023, Dean Leon Samuels ("Samuels") received a student complaint regarding the administration of the election results.

17.     The complaint, brought by two white students, complained that students who were not "members" of WLC were allowed to vote in the WLC election and have their votes counted (again, even though WLC did not have official "members").

18.     The complaining students previously had displayed unfounded animosity for example prior to the 2023 election as a result of certain events. Previously the WLC Events Coordinator Lauren Ballenger aka Smyser resigned from her position as WLC Events Coordinator after Leyva told Ballinger aka Smyser that she could change events without consulting her. This occurred after Leyva pleaded with Smyser over the phone to please include Leyva in the planning of the club events and not change the events as Smyser was doing in

conjunction with the President of a completely separate student club. Smyser continued to not include Leyva in the meetings and planning of the events. So, Leyva continued to make efforts to be a part of organizing events to no avail, at every turn she was cut out of making presidential decisions. Leyva stated, following this student's resignation, "I felt a lot of tension between myself and other board members and advisors. I tried to talk things through with [Smyser] but she decided that she was done with me." The events that followed led to Maryanna Whitt being nominated to fill in Smysers position, however, this change was one of the largest factors that led to the events that give rise to Leyva's discrimination claims. Maryann Whitt together with other women in the WLC student club joined together to mock and accuse Leyva of serious allegations that would hurt her emotionally, academically and professionally.

19.   Witt would continuously mock Leyva during meetings and behind her back to colleagues and not permit Leyva to make critical decisions for the group.

20.   Similarly, during a meeting between Leyva and Witt, who was the-newly nominated WLC Events Coordinator i.e. the complaining student described Leyva as "micromanagey" and controlling. Leyva told her how her words and actions made her feel and that, as the first Latina to serve in the role, Leyva felt like "she was alienating me and that it hurt that at every turn I was being stereotyped." Previous to calling for a meeting Witt would have lunch in the student lounge where a witness heard her mocking Leyva by saying that Leyva was not a good president and that Leyva did not know how to run a student group. Witt would also tell other colleagues in the student lounge loud enough for Leyva's witness to hear that Leyva had called Witt a racist over the phone discussion, even though Leyva had only shared how the stereotypes made her feel. Leyva never called Witt a racist during the meeting.

21.     Eventually, Witt decided to call a meeting with faculty members to accuse Leyva of many things among them that Leyva was "micromanagy," and that Leyva had told Witt that the WLC constitution did not matter. In attendance at this large meeting was Leyva, the WLC board, Professors Katheryn Ball, Wendy Couture, and Dean Samuels. Dean Leon Samuels "facilitated" the meeting, where to Leyva's surprise, she was humiliated by Witt and had to sit through the meeting. Leyva was not permitted to speak until the end of the meeting to address the accusations. The Dean of Students, Professor Ball, and Professor Couture did not stay behind to make sure that Leyva was well or to provide any words of encouragement as they did for the students that humiliated her and mocked her. This caused Leyva emotional pain but was not a surprise to her as Professor Ball was never supportive of Leyva throughout her time at the law school. Leyva was aware that Professor Ball also provided board members with many professional opportunities while she almost never offered any sort of professional support to Leyva. Except in situations where Leyva would seek Professor Ball to report discrimination during Leyva's first year of law school, and when Professor Ball made general remarks about the quality of Leyva's legal writing without providing feedback during Leyva's second year of law school.

22.     Following this large meeting Witt called, Leyva continued to make efforts to serve in her official Presidential duties, however Witt in conjunction with the support of the advisors did not allow this. It has been custom that the largest WLC event is facilitated by the President. However, during Leyva's presidency Witt did not allow this to happen and instead told Leyva and the advisors that she would facilitate, and the advisors supported her in this, even when Leyva informed Witt and the advisors that was not the custom.

23.     The tension and animosity towards Leyva never ceased and got worse as the year
ended when Maryann Witt alone or together with other board members filed a student complaint
alleging that Leyva had somehow committed voting fraud or a student violation of the code of
ethics because Leyva had permitted all students enrolled at the law school to vote in the 2023-
2024 WLC election.

24.     Leyva received an email from Professor Kathryn Ball and Laegan Meyers
demanding that Leyva turn over the Google voting poll. Leyva believed this was wrong for many
reasons, especially for privacy and because no other president had been forced to turn over
sensitive voting information. Professor Ball demanded that Leyva provide Professor Ball and
Dean Samuels with that information, so Leyva did so within 24 hours. Before Leyva did this
however she emailed the faculty many times with sections of the WLC Constitution and custom
to show that she in fact had the authority to permit all U of I College of Law students to vote in
the election.

25.     To Leyva's disappointment, she also emailed Professor Wendy Couture directly
but Professor Wendy Couture did not make efforts to respond or to speak to Leyva at all. During
the same day or within the few days that Leyva had emailed Professor Couture, Levya was
saddened to see Professor Couture chatting and laughing with Witt as they walked together into
the school elevator. Professor Couture did not acknowledge Leyva at this time either even as
Leyva was in close proximity and faced Professor Couture directly (even making eye contact).
This together with all of the events and actions taken against her gave Leyva the impression of
serious institutional bias and discrimination against her.

26.     While all of Leyva's colleagues were studying for finals and a critical exam i.e.
the bar exam, faculty together with the WLC board joined to accuse Leyva at a very sensitive

time. This caused Leyva serious emotional harm, as a result she was unable to focus on studying for finals and the bar exam during these events and the whole summer of 2023. Leyva was unable to carry the weight of these serious allegations and even leaving her bed was a difficult task as she cried and hoped that faculty and her colleagues would stop.

27.     After making many efforts Leyva gave up when she received a shocking email that shook her, sent to her by Dean Samuels. Dean Samuels emailed her demanding that she do what the faculty were telling her to do because Dean Samuels had "received text message and social media evidence," he alleged that Leyva had told a student to not tell others that she had asked the student to vote in the election. Dean Samuels claimed that somehow this meant Leyva knew she did not have constitutional authority to permit this student to vote. However, this theory was not truthful, both for personal reasons and constitutional ones. The personal reason was that Leyva had knowledge that Witt had moved the law school to have another minority student at the law school banned from a legal education based on serious allegations that Witt made against this student. Witt also defamed that student on the law school campus by sharing these sensitive allegations with many women. Eventually Leyva was of the belief that turning over the voting polls would permit her to end the hostility against her and permit her to study for her finals and the bar exam.  So, she set up a meeting with Dean Samuels to provide the voting data.

28.     It was at the meeting with Dean Samuels where he ignored Leyva's pleas and demands for Dean Samuels to follow the WLC constitution and not overreach his authority. Dean Samuels ignored her, huffed at her, and at times rolled his eyes or gave Leyva his back. To Leyva's surprise, during the meeting Dean Samuels reached over the table towards Leyva and took her laptop, dragged it to his side where Leyva could not see what he was accessing. Leyva

later found out that Dean Samuels had uploaded the Google voting poll document to the cloud without her consent (making it public), just as he had taken her computer without consent.

29.    The complaining students allegedly provided the University with copies of text messages and social media posts purportedly depicting communications from Leyva about the WLC election. The University did not provide this evidence to Leyva or allow her to address it. The University asserted that it is prohibited from providing this information under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g(a)(4)(A). FERPA generally restricts disclosure of students' "education records" without their consent, where "education records" is defined to mean records that are "directly related to a student" and that are "maintained by an educational agency or institution or by a party acting for the agency or institution."

30.    On information and belief, the social media posts and text messages are not "education records" within the meaning of FERPA.

31.    On information and belief, the University did not even attempt to seek consent of the pertinent students (i.e., those whose names purportedly appeared in the social media posts and text messages) to disclose the evidence to Leyva.

32.    On information and belief, the University also did not seek a method of disclosure to Leyva that would protect the other students' identities, such as through redaction.

33.    Based on the complaining students' complaint and information submitted with the complaint, Dean Samuels determined that some students' votes should not be counted. Dean Samuels overturned and modified the results by omitting those votes, overturning the results of the election and therefore selecting a different WLC president, preferred by the complaining white students.

34. Leyva scheduled an urgent meeting to discuss the decision with Dean Johanna Kalb where she asked Leyva if "she really wanted her to investigate past elections," ignored Leyva as she spoke to her about the WLC constitution and past elections, and cut Leyva off as she spoke. The discussion led to no proper resolution and Leyva decided to leave Dean Kalb's office because Leyva felt like it was not going to result in a fair hearing for her.

35. On or about April 25, 2023, two WLC faculty advisors, Professors Kathryn Ball and Wendy Couture, notified students that the preliminary election results after the election had since been modified. They explained that the modification was made pursuant to the "ordinary Dean of Students' review process" because votes from students they contended were not WLC "members" were "inadvertently" tallied along with votes from students they contended were WLC "members." They further stated:

> We understand it may have been past practice to include votes from anyone in the student body in calculating WLC election results. However, this contravenes the Constitution, which limits voting to "general membership" and "current members." We encourage the new WLC Board to consider whether to make changes to your Constitution or the election process if WLC intends to allow all students to vote in the next election and to determine whether other amendments are necessary to reflect your desired practices.
>
> Based on the constitutional requirement, we determined that it was necessary to recount the votes and exclude those made by non-WLC members.

36. Kalb, Samuels, Ball, and Couture took extraordinarily swift action to consider the white students' complaints and to overturn the WLC election. On information and belief, the University's College of Law, Kalb, Samuels, Ball, or Couture have seldom, if ever, taken action so *quickly* on a student complaint.

37. Leyva filed an appeal of the election results. In her appeal, Leyva raised a concern that Dean Samuels's and faculty's actions were motivated by discrimination.

38.     On May 3, 2023, Dean of the Law School, Johanna Kalb, received Leyva's appeal. But Dean Kalb effectively suspended the appeal, only because Leyva reported discrimination. Kalb alerted the University's Office of Civil Rights and Investigations ("OCRI"), the office responsible for ensuring compliance with federal and state laws related to discrimination based on a protected class, about Leyva's report of discrimination.

39.     Dean Kalb's referral of Leyva's report of discrimination to OCRI resulted in a long delay of the decision on Leyva's appeal, which was about an extremely urgent issue: the results of the WLC election. Students, especially students involved with WLC and Leyva herself as an outgoing law student, needed resolution and closure to that election.

40.     OCRI's process involves review of a complaint by investigators specially trained to investigate reports of discrimination. Investigators may conduct interviews and collect information. OCRI may determine that the information presented does not constitute a violation or that a further investigation is not warranted based on the information submitted. On June 9, 2023, OCRI notified Leyva that it had determined that there was no articulable basis to substantiate her claims of discrimination.

41.     Before graduation, Levya was having lunch on campus when her colleague approached her to tell her something shocking. This colleague told Leyva that Witt had spoken directly to her right before their class began to inform the colleague that she would be called to be a witness in the honor court proceeding filed against Leyva. This caused Leyva a lot of distress and emotional pain because she was already facing extreme hostility from her colleagues and faculty. One example that occurred shortly after is when Leyva would appear for bar prep over the summer, colleagues that were once her friends would ignore her and whisper the accounts of what they had heard to each other disregarding that Leyva was close enough to hear.

These individuals were persons Leyva previously had close connections with and had built a reputation with, but those ties no longer exist as a result of the allegations that were spread on the law school campus. The overall result was that Leyva felt so alienated, depressed, and anxious that she no longer felt the will to participate in the summer bar prep course, something that was critical in her success or lack of on the bar exam. Further, sharing the allegations to members of the campus was an express violation of the student code of conduct, so Leyva reported this act of defamation against her to the honor court as well before the semester had ended for the school year. Leyva appeared for a probable cause hearing for the filing made against her, but it is unknown if the women that accused her of violating student code and rigging an election were required to do the same for their violation. As their actions were an express violation of the code of conduct, the remedy would be to be reprimanded. Leyva suspects that because of institutional bias and favoritism, these women were not reprimanded even after all the emotional and professional harm these events caused her.

42.     Throughout the summer that Leyva should have only been studying for the bar exam, she pleaded with Dean Kalb many times to issue a decision on her appeal. Dean Kalb would ignore Leyva or continue to tell her that she was unable to, even though the University had acted swiftly and within 24 hours on Witt's complaint against Leyva. The faculty did not provide Leyva with the processes that the student handbook required such as an opportunity for the student body to deal with allegations of student club voting problems.

43.     On July 17, 2023, Dean Kalb notified Leyva that her appeal had been denied. The College of Law's student complaint process provides that the Dean's decision on an appeal "shall be communicated to the appellant . . . ordinarily within 20 days" after the appeal is submitted. Dean Kalb did not issue her decision until **75** days after Leyva submitted her appeal.

On information and belief, the College of Law or Kalb have seldom, if ever, taken action so *slowly* on such an appeal.

      44.     Dean Kalb wrote, in part:

> Under University policy, governed by the Faculty-Staff Handbook, a decision related to a student grievance about regulations and requirements is reversible only upon a finding of clear error. The question for me, therefore, is not whether alternative readings of the WLC Constitution are plausible, but only whether Dean Samuels' actions in this case were clearly erroneous. Having reviewed the WLC Constitution, I do not find Dean Samuel's interpretation of its language on elections to be clearly erroneous, a finding that is bolstered by his consultation with the two long-term faculty advisors to this club in reaching the decision both on the Constitution's meeting and the appropriate remedy.

      45.     The WLC Constitution vests authority to administer elections solely in the WLC president.

      46.     The WLC Constitution provides no grounds for faculty or administrators to overturn the election.

      47.     The University, through WLC faculty advisors, admitted that the election was administered in the same fashion as it always had been administered. Nonetheless, because of a complaint made by white students to white faculty about an election administered by a Latina student, the election results were overturned, on information and belief, for the first time in the Idaho WLC's history based on a practice that white students had followed for years without complaint. On information and belief, this result occurred because the University, through the actions of Law School faculty, affirmed, ratified, must have supported the discriminatory actions of the complaining white students.

### Housing Clinic

      48.     During the spring 2023 semester, Leyva participated in the College of Law's Housing Clinic. Leyva decided to participate in the clinic after being pressured by Dykstra for

weeks together with Dykstra's false claims and promises that Leyva and all students in his clinic would be given an A letter grade.

49.     Leyva was the only woman and only student of color participating in the housing clinic that semester.

50.     The clinic's supervisor, Jason Dykstra, repeatedly preferred the white male students in the clinic over Leyva, by giving the white male students more and better opportunities and by rewarding and, on information and belief, grading them more favorably and leniently.

51.     For example, Dykstra offered an opportunity to one of the white men in the clinic to speak on a radio talk show; yet Dykstra did not even ask Leyva if she was interested.

52.     Likewise, Dykstra offered the same white male student in the clinic the opportunity to moderate a housing clinic event; but yet again Dykstra did not even ask Leyva if she was interested.

53.     All students in the clinic were required to provide support to Jesse Tree, a social services organization in Boise that works to prevent eviction and homelessness in the Treasure Valley.

54.     Jesse Tree's eviction program manager praised Leyva as the best law student working with the organization that semester. Yet Dykstra rewarded the same white male student given the award for best Housing Clinic student, even though there are no witnesses at Jesse Tree that are aware of this student attending the eviction hearings Spring Semester.

55.     Dykstra would often ask the white male students in the clinic what they thought about certain legal issues, but never asked Leyva what she thought about them. Dysktra would even ignore or dismiss Leyva's legal opinions or input. And on the other hand, Dykstra would

instruct Leyva to "be professional" when speaking with a client but, on information and belief, never instructed the white male students like that.

56.     Dykstra allowed—and even encouraged—students in the clinic to exaggerate their hours and "overbill." Leyva, however, told Dykstra that she did not need to "overbill" because she was doing all the work assigned and meeting her hourly billing expectations. At one meeting Dykstra Handed Leyva a dollar bill and asked her to "keep attorney client privilege," and "to not tell Professor Jessica Long anything of the meeting."

57.     At the same above mentioned meeting that Dykstra required Leyva to attend, he stood up next to Leyva while she was sitting and told her to look at his belt that his mother had gifted to him, while he grabbed it with both of his hands, grabbing the buckle in a way that displayed his crotch toward Leyva. Leyva was very embarrassed because she never had any desire to look at Dykstra's crotch and she felt that she had no choice.

58.     On information and belief, Dykstra gave the white male students in the clinic that semester As, but he gave Leyva a B+. Leyva believes that the grading discrimination was also retaliation, because Dykstra suggested during a class that the law school cut ties with Jesse Tree for reporting him to Professor Jessica Long. Dykstra shared this during the class and asked the men in the clinic what they thought. One male student responded and sided with Dykstra, the other student (that won the award) abstained. While Leyva openly and strongly disagreed with Dykstra.

59.     Leyva reported experience of discrimination in the Housing Clinic to a clinic coordinator, as well as to Jesse Tree staff who, on information and belief, reported it to clinic staff. She also filed a complaint of discrimination, based on her experience in the Housing Clinic, with the Idaho Human Rights Commission. The Idaho Human Rights Commission, however,

stated that it did not have jurisdiction over Leyva's complaint about her Housing Clinic experience.

## COUNT ONE

**Violation of Title IX of the Education Amendments of 1972
Deliberate Indifference to Gender Discrimination
and Hostile Educational Environment**

60.     Plaintiff realleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

61.     At all times relevant to this action, Plaintiff was enrolled as a law student at the University's College of Law.

62.     At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

63.     Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Victims of sex discrimination have a private right of action against recipients of federal education funding for alleged Title IX violations and may seek damages for those violations.

64.     The University has discriminated against Plaintiff by subjecting her, through deliberate indifference, to discrimination based on her gender, including disparate treatment and a hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with her educational opportunities and deprive her of the benefits of the University's educational programs. Relevant actions include, but are not limited to, the conduct listed below as to each of the five elements of a Title IX claim of deliberate indifference:must have

       a.   The school exercised substantial control over the person(s) engaging in discrimination (harassment) and the context in which the discrimination

(harassment) occurred. Here, the University exercised substantial control over both the Housing Clinic and the faculty who processed and sustained the white students' complaint about the WLC election and over the context in which it occurred: the election of officers for WLC. The WLC is a school-supported organization with faculty advisors. Dean Samuels exercised substantial control over the election by overturning its results.

b.  The plaintiff suffered harassment so severe, pervasive, and objectively offensive that it can be said to deprive her of access to the educational opportunities or benefits provided by the school. Here, the University's handling of the white students' complaint about Plaintiff's election administration, the University's decision to overturn the election results even though Plaintiff had followed the same procedure as her white predecessors, the University's rapid resolution of the other students' complaint compared to its lengthy delay in resolving Leyva's appeal, its delay in resolving Leyva's appeal *because* she reported discrimination, and her disparate treatment and harassment in the Housing Clinic together constituted multiple acts of discrimination that humiliated Plaintiff and created an atmosphere so hostile that she was unable to receive the same educational benefits as her white counterparts.

c.  A school official with authority to address the alleged discrimination and to institute corrective measures had actual knowledge of the harassment. Here, Dean Samuels, Dean Kalb, and OCRI officials all had actual knowledge that the WLC election had been conducted in the same manner for years and was not overturned until a Latina conducted the election. Each official had the opportunity to address

it: Dean Samuels had the opportunity to not sustain the complaint, or to sustain the complaint but allow the election results to stand and require the WLC to institute new policies for future elections; Dean Kalb had the opportunity to not accept Dean Samuels's decision or even just to process Leyva's appeal within ordinary time limits and not to delay resolution because Leyva reported discrimination; OCRI had the opportunity to conduct a full investigation by analyzing the historical election procedures, the substance of and motivation for the complaints brought by white students, and the veracity of the evidence attached to those students' complaint. The clinic staff coordinator and other clinic staff had the opportunity to investigate discrimination and concerns that Leyva reported, or to refer to administration or OCRI for investigation. Each of these officials also had the knowledge and opportunity to properly address Plaintiff's own complaint by presenting her with the evidence so she could respond to it.

d.  The school acted with deliberate indifference to the harassment, such that the school's response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances. Here, the University made a decision to not remedy the discrimination: the school did not interview the witnesses, did not show Plaintiff the evidence filed against her, did not take into account the historical validity of the WLC election process, and did not address the fact that the complaint was made only because Plaintiff is Latina and had delegated authority under the WCL constitution to run the election. The University likewise did not investigate or take any other measures to address the discrimination Leyva experienced in the Housing Clinic. The University could have made corrective

measures outlined above and chose not to. This was clearly unreasonable in light of the circumstances.

    e.   The school's deliberate indifference subjected the plaintiff to harassment, i.e., caused her to undergo harassment or make her liable or vulnerable to it. Here, the University has historically failed to implement a meaningful process for many years as to complaints at the law school about discrimination.

65.    Because of the University's actions and failures to act, Leyva has suffered and will continue to suffer harm and damages, including those harms and damages detailed above in paragraph four.

66.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees (if Plaintiff is able to secure counsel) and costs, and other appropriate relief.

## <u>COUNT TWO</u>

### Violation of Title VI of the Civil Rights Act of 1964
### Discrimination Based on Race, National Origin, and Color

67.    Plaintiff realleges and herein incorporates the allegations set forth in all prior paragraphs.

68.    Plaintiff is Latina and of Hispanic descent.

69.    At all times relevant to this action, Plaintiff was enrolled as a law student at the University's College of Law.

70.    At all times relevant to this action, the University has received, and continues to receive, federal financial assistance.

71.    Title VI of the Civil Rights Act of 1964 prohibits race and ancestry discrimination by providing that "no person in the United States shall, on the ground of race, color, or national

origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000(d) (1964).

72.     The University discriminated against Plaintiff based on her race, color, and/or national origin by engaging in the conduct alleged above, including without limitation the following actions:

a.      The University, through its faculty, received and entertained a complaint about the WLC officers' election based on allegations of procedural impropriety even though the WLC elections had followed the same procedure in all prior years when the election was administered by a white WLC president. The University sustained the challenge and overturned the election results even though the WLC president (Plaintiff) followed the same procedure as her white predecessors. The University made this decision not because of actual procedural irregularity but because of discriminatory animus against Plaintiff because of her race, color, and/or national origin. Likewise, the University's faculty discriminated against Leyva in the Housing Clinic, through different treatment compared to white male students in that clinic and harassment, and the University failed to investigate or correct that discrimination after learning about it.

b.      This discriminatory animus is evidenced in the University's disparate treatment of the white male students in the Housing Clinic and of the white students' complaint versus Leyva's appeal, the overturning of the WLC election despite Leyva's sole authority to administer it and her administration of that election consistent with history, and the white students' treatment of Plaintiff prior to the election by refusing to work with her.

c.     In processing the complaint of election procedural impropriety, the University considered evidence that the University did not provide Plaintiff any opportunity to review or respond to. The University could have done so either by recognizing that text messages and social media posts not "maintained" by the University are not "education records" within the meaning of FERPA, or by redacting other students' names. The University's refusal to provide this information to Plaintiff was not supported by any legitimate reason and was because of discriminatory animus against Plaintiff because of her race, color, and/or national origin.

d.     The University processed, investigated, and resolved the white students' complaint about the election with extraordinary swiftness; but the University processed and resolved Leyva's appeal from that complaint extraordinarily slowly—and delayed processing and resolving it because Leyva reported discrimination.

e.     Accordingly, the stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to hide the Defendant's discriminatory animus.

73.   As a result of the University's actions, the Plaintiff was denied the opportunity to participate in WLC, WLC leadership, and the WLC election process in the same fashion as her white counterparts. This caused Plaintiff humiliation and emotional distress that interfered with Plaintiff's ability to receive an education in the manner her white counterparts received an education.

74.   The University violated Title VI by subjecting Plaintiff to a hostile learning environment because of race.

75.   As a direct and proximate cause of the University's actions and/or failure to act, Plaintiff has suffered and will continue to suffer physical distress as well as emotional distress

consisting of outrage, shock, and humiliation due to the hostile learning environment she experienced.

76.     As a direct and proximate cause of the University's actions and/or failure to act, Plaintiff has suffered loss of educational opportunities, employment opportunities, and associated opportunities. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be determined at trial, as well as any other equitable remedies available.

## COUNT THREE

### Violation of Idaho Human Rights Act
### Discrimination based on Sex, Race, National Origin, and Color

77.     Plaintiff realleges and herein incorporates the allegations set forth in all prior paragraphs.

78.     Plaintiff is Latina and of Hispanic descent.

79.     At all times relevant to this action, Plaintiff was enrolled as a law student at the University's College of Law.

80.     It is a prohibited act under the Idaho Human Rights Act ("IHRA") for an educational institution to discriminate against a person because of or on a basis of race, color, religion, sex or national origin. I.C. § 67-5909(7). This includes limiting or otherwise discriminating against an individual enrolled as a student in the terms, conditions, and privileges of the institution. I.C. § 67-5909(7)(a).

81.     The University discriminated against Plaintiff because of her race, color, sex, and national origin, in the terms, conditions, and privileges of the University, by engaging in conduct set forth below:

a.     The University, through its faculty, received and entertained a complaint about the WLC officers' election based on allegations of procedural impropriety even

though the WLC elections had followed the same procedure in all prior years when the election was administered by a white WLC president. The University sustained the challenge and overturned the election results even though the WLC president (Plaintiff) followed the same procedure as her white predecessors. The University made this decision not because of actual procedural irregularity but because of discriminatory animus against Plaintiff because of her race, color, and/or national origin. Likewise, the University's faculty discriminated against Leyva in the Housing Clinic, through different treatment compared to white male students in that clinic and harassment, and the University failed to investigate or correct that discrimination after learning about it.

   b.     This discriminatory animus is evidenced in the University's disparate treatment of the white male students in the Housing Clinic and of the white students' complaint versus Leyva's appeal, the overturning of the WLC election despite Leyva's sole authority to administer it and her administration of that election consistent with history, and the white students' treatment of Plaintiff prior to the election by refusing to work with her.

   c.     In processing the complaint of election procedural impropriety, the University considered evidence that the University did not provide Plaintiff any opportunity to review or respond to. The University could have done so either by recognizing that text messages and social media posts not "maintained" by the University are not "education records" within the meaning of FERPA, or by redacting other students' names. The University's refusal to provide this information to Plaintiff was not supported by any legitimate reason and was because of discriminatory animus against Plaintiff because of her race, color, and/or national origin.

d.     The University processed, investigated, and resolved the white students' complaint about the election with extraordinary swiftness; but the University processed and resolved Leyva's appeal from that complaint extraordinarily slowly—and delayed processing and resolving it *because* Leyva reported discrimination.

e.     Accordingly, the stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to hide the Defendant's discriminatory animus.

82.     The University also retaliated against Leyva for engaging in activity protected by the Idaho Human Rights Act. It delayed processing and resolving Leyva's appeal from the decision to overturn the WLC results, taking months (rather than the 20 days or less that such appeals ordinarily should take under the College of Law policies) to render an appeal decision *because* Leyva reported discrimination. On information and belief, Leyva's B+ grade in the Housing Clinic, compared to the A grade she suspects her white male colleagues in the clinic received, was the product of retaliation for her reporting of concerns about discrimination in the Housing Clinic and continued support for Jesse Tree.

83.     As a result of the University's actions, the Plaintiff was denied the opportunity to participate in WLC, WLC leadership, and the WLC election process in the same fashion as her white counterparts. This caused Plaintiff humiliation and emotional distress that interfered with Plaintiff's ability to receive an education in the manner her white counterparts received an education.

84.     As a direct and proximate cause of the University's actions and/or failure to act, Plaintiff has suffered and will continue to suffer physical distress as well as emotional distress consisting of outrage, shock, and humiliation due to the hostile learning environment she experienced.

85. As a direct and proximate cause of the University's actions and/or failure to act, Plaintiff has suffered loss of educational opportunities, employment opportunities, and associated opportunities. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be determined at trial, as well as any other equitable remedies available.

## ATTORNEYS' FEES

86. Plaintiff may incur attorneys' fees and costs in pursuing this action and seeks an award of such fees and costs pursuant to Title VI, Title IX, the IHRA, Idaho Code 12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable law.

## DEMAND FOR JURY TRIAL

87. Plaintiff demands a jury trial on all issues so triable pursuant to F.R.C.P. 38(b).

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that judgment be entered against Defendant as follows:

1. Damages in an amount to be determined at trial;

2. A judgment declaring that Leyva's rights were violated.

3. An award of reasonable attorneys' fees and costs pursuant to to Title VI, Title IX, the IHRA, Idaho Code 12-121, Rule 54 of the Federal Rules of Civil Procedure, and all other applicable law; and

4. An award of such other relief as the Court deems just and proper.

Dated: May 29, 2024

Rosa Maria Leyva
Plaintiff