UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSA MARIA LEYVA,<br><br>                Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF IDAHO,<br><br>                Defendant. | Case No. 1:24-cv-00263-DCN<br><br>**ORDER** |

## I.   INTRODUCTION

Before the Court is Plaintiff Rosa Maria Leyva's Application to Proceed In Forma Pauperis ("Application"). Dkt. 1. Under 28 U.S.C. § 1915, the Court must review Miller's request to determine whether she may proceed without prepayment of the required filing fee. *Rice v. City of Boise City*, 2013 WL 6385657, at *1 (D. Idaho Dec. 6, 2013). The Court must also screen Leyva's Complaint, pursuant to 28 U.S.C. § 1915(e)(2). For the reasons below, the Court GRANTS Leyva's Application. However, it finds that her Complaint fails to state a claim on which relief can be granted. Accordingly, the Court will allow Leyva thirty days to file an amended complaint remedying the deficiencies outlined herein.

## II. BACKGROUND

Leyva is an Idaho resident who recently graduated from the University of Idaho College of Law (the "Law School"). During her final year at the Law School, Leyva served as president of the Women's Law Caucus (the "WLC"). She also participated in the Law School's Housing Clinic—a class wherein law students are connected with local

ORDER - 1

organizations and individuals looking for legal aid related to housing.

In her Complaint, Leyva alleges that the Law School has discriminated against her on the basis of her race, color, national origin, and gender, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq*. ("Title VI"), and the Idaho Human Rights Act, Idaho Code § 67-5909 *et seq*. (the "IHRA"). *See* Dkt. 2. Leyva's allegations arise out of the Law School's actions related to a WLC election in which she was involved, and her treatment by a professor while participating in the Housing Clinic. The Court will briefly summarize the relevant factual background, beginning with Leyva's election allegations, then moving to her Housing Clinic allegations.

**A. WLC Election**

At the end of each school year, the WLC holds elections to select club officers for the subsequent year. Under the WLC Constitution, the club's president plays a significant role in election administration. Leyva claims that she administered the WLC election in a manner consistent with past presidents, all of whom, she notes, were white. However, this year, once the results were announced, two students—who are also white—complained that Leyva had allowed individuals who were not members of WLC to vote in the election. Leyva does not deny this, but claims that WLC has no formal membership criteria— meaning exclusion of non-members would have been impossible. Leyva also notes that she had had prior run-ins with the complaining students, both of whom she worked with in WLC leadership. According to Leyva, during their time together, the three had disagreements about their roles and responsibilities in the club.

In response to the students' complaint, two professors emailed Leyva, asking her to turn over the voting results for review. Leyva declined, and emailed Leon Samuels, the Assistant Dean of Student Affairs, explaining the situation and seeking his support. Dean Samuels replied and set up a meeting with Leyva. At the meeting, Leyva alleges that Dean Samuels took her laptop and uploaded the voting data to the cloud without her consent.

Dean Samuels allegedly reviewed the voting data, along with screenshots of text messages and social media posts submitted by the two complaining students. At the end of his review, he concluded that only votes by WLC members should have been counted. He subsequently modified the election results accordingly. Shortly thereafter, Leyva tried to "appeal" Samuels' decision, arguing that the actions of the faculty members in fielding and promptly responding to the complaint submitted by two white students, were motivated by racial discrimination.[1] Because Leyva alleged racial discrimination, the law school's dean, Johnanna Kalb, referred Leyva's appeal to the University of Idaho's Office of Civil Rights and Investigations ("OCRI"). Upon review, the OCRI informed Leyva that there was no articulable basis to substantiate her claims of discrimination. Apparently, the issue was then returned to the Law School. After its review of the facts, Dean Kalb informed Leyva that, pursuant to school policy, she could reverse Dean Samuels' actions only upon a finding of clear error. Dean Kalb stated that she could make no such finding here.

**B.  Housing Clinic**

As noted above, in her final semester, Leyva participated in the Law School's

---

[1] The appeal process Leyva followed is not entirely clear from her Complaint.

Housing Clinic. The clinic was supervised and directed by Professor Jason Dykstra. Leyva states that she was both the only woman and the only student of color participating in the clinic during that semester.

Leyva complains that Professor Dykstra gave the white male students more opportunities, better opportunities, and better grades in the clinic. In support of this contention, she claims that that Professor Dykstra invited a white male student to speak on a radio talk show and to moderate a Housing Clinic event without first asking Leyva if she was interested. Leyva complains that the award for Best Housing Clinic Student was given to a white male student instead of to her. She also states that she suspects the white male students all received As but that she received only a B+, despite doing comparable work. Finally, she asserts that on one instance, Professor Dykstra showed her a belt buckle he was wearing in a manner that "displayed his crotch toward Leyva," and that made Leyva feel embarrassed and uncomfortable.

### III.  LEGAL STANDARDS

#### A.  Proceeding *In Forma Pauperis*

"[A]ny court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal . . . without prepayment of fees or security therefor." 28 U.S.C. § 1915(a)(1). Plaintiffs granted this privilege are said to proceed in the form of a pauper, or *in forma pauperis*. *See In Forma Pauperis*, Black's Law Dictionary (11th ed. 2019). To qualify for *in forma pauperis* status, a plaintiff must submit an affidavit that includes a statement of all assets she possesses and indicates that she is unable to pay the fee required. The affidavit is sufficient if it states that the plaintiff,

because of her poverty, cannot "pay or give security for the costs" and still be able to provide herself and her dependents "with the necessities of life." *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948). Such an affidavit must "state the facts as to affiant's poverty with some particularity, definiteness and certainty." *United States v. McQuade*, 647 F.2d 938, 940 (9th Cir. 1981) (cleaned up).

Though a litigant need not be destitute to proceed *in forma pauperis*, "even-handed care must be employed to assure that federal funds are not squandered to underwrite, at public expense . . . the remonstrances of a suitor who is financially able, in whole or in material part, to pull his own oar." *Esquer v. Educ. Mgmt. Corp*., 2017 WL 11453700, at *1 (S.D. Cal. June 26, 2017) (quoting *Temple v. Ellerthorpe*, 586 F. Supp. 848, 850 (D.R.I. 1984)). Thus, district courts have rejected these applications when the applicant can pay some fee by making acceptable sacrifices. *See Esquer*, 2017 WL 11453700, at *1 (collecting cases).

When a plaintiff cannot pay the full filing fee, courts may impose a lesser fee. *Olivares v. Marshall*, 59 F.3d 109, 111 (9th Cir. 1995). The court has discretion to determine the fee amount, but it must be tailored to the plaintiff's income and assets and "should not take the [plaintiff]'s last dollar." *Id.* at 112. If a plaintiff fails to pay this partial fee, the court may dismiss her complaint without prejudice. *Id.*

## B. Screening Requirement

The Court is required to screen complaints that are brought by litigants who ask to proceed *in forma pauperis*. 28 U.S.C. § 1915(e)(2). The Court must dismiss a complaint, or any claim, that states a frivolous or malicious claim, fails to state a claim upon which

relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *Id.* at §§ 1915(a)(1) & (e)(2). During its review, the Court must construe a complaint liberally, giving a pro se plaintiff the benefit of any doubt. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Even so, plaintiffs—whether represented or not—must articulate their claims clearly and allege facts sufficient to support review of each claim. *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).

A complaint fails to state a claim for relief under Rule 8 of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. DISCUSSION

### A. Proceeding *In Forma Pauperis*

Leyva has established that she is currently making less money than she spends in a month. Her filings indicate that her total monthly income is $2,300.00 while her expenses fall around $2,440.00. Leyva's expenses include very little, if any, discretionary spending. She is a single mother of one and has only a small amount of cash on-hand. Her sole asset of significant monetary value is her car.

Considering the foregoing, the Court is satisfied that if Leyva were required to pay a filing fee in this case, she would not be able to provide the necessities of life for herself and her dependent. *Adkins*, 335 U.S. at 339. Accordingly, the Court GRANTS Leyva's request to proceed *in forma pauperis* and WAIVES her filing fee in its entirety.

**B.  Screening of Leyva's Complaint**

Pursuant to 28 U.S.C. § 1915(e)(2), the Court will evaluate each of Leyva's three claims against the Law School.

*1.  The Title IX Claim*

In her first claim, Leyva alleges that the Law School's actions with regard to the WLC elections and the Housing Clinic constitute deliberate indifference to discrimination on the basis of sex and a hostile educational environment in violation of Title IX. Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Victims of sex discrimination have a private right of action against recipients of federal education funding for alleged Title IX violations." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020).

A plaintiff bringing a Title IX claim must begin by alleging that the defendant is a recipient of federal financial assistance and that the plaintiff experienced sex discrimination. *Id.* at 1105, n.1. A party experiences sex discrimination when the party is disfavored "because of" his or her sex. *See, e.g.*, *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

After this preliminary showing, a plaintiff must allege facts enough to establish five elements. *Karasek*, 956 F.3d at 1105. First, that the school "exercised substantial control over both the harasser and the context in which the known harassment occurred." *Id.* (cleaned up). Next, that the harassment she suffered was "so severe, pervasive, and

objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school." *Id.* (cleaned up). Third, that "a school official with authority to address the alleged discrimination and to institute corrective measures on the school's behalf" had actual knowledge of the harassment. *Id.* (cleaned up). Fourth, that the school was deliberately indifferent to the harassment, "such that the school's response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances."[2] Finally, that the school's deliberate indifference subjected the plaintiff to harassment. *Id.* In other words, "the school must have caused the plaintiff to undergo harassment or made the plaintiff liable or vulnerable to it." *Id.* (cleaned up).

a.   Threshold questions

The Court begins with the two threshold questions. Leyva has alleged that the University of Idaho receives federal financial assistance, and the Court has no reason to doubt that assertion. Whether Leyva was discriminated against "because of" her sex, however, is less clear.

Turning first to her experience in the Housing Clinic, Leyva complains that she was not selected to speak on a talk show, moderate an event, or receive an award. Dkt. 2, at 14. She summarily declares that these facts demonstrate sex discrimination. *Id.* at 16. But Leyva has provided no facts that indicate she was denied these opportunities *because of* her sex. These are opportunities that, by their nature, can be awarded only to one, or at most, to a small group of students. The fact that Leyva was not one of the lucky few surely must have

---

[2] "This is a fairly high standard—a negligent, lazy, or careless response will not suffice." *Id.* (cleaned up).

been disappointing. However, Dykstra's selection of a male for these two opportunities and one award does not beg the conclusion that he did so with discriminatory animus. And despite Leyva's implications, Title IX does not require Dykstra to give female students a first right of refusal on extracurricular opportunities. To hold otherwise would suggest that any school that gives a male an award or a limited opportunity opens itself up to liability. Because Leyva has not pled a causal connection between her sex and her perceived slights, her claim cannot go forward on these grounds.

Similarly, despite her suspicions that Dykstra *unfairly* gave the male students in the Housing Clinic higher grades, Leyva has not alleged facts to support this conclusion. Leyva relies on the fact that the manager of a local housing assistance organization "praised Leyva as the best law student working with the organization that semester." Dkt. 2, at 14. But the opinion of one satisfied colleague does not show that Leyva was entitled to a particular grade. Further, Leyva notes that she was the only woman in the Housing Clinic. *Id.* Thus, unless she was the top student in the class, there were bound to be men in the class who received better grades than she did. By design, grades discriminate. But from Leyva's suspicions alone, the Court cannot reasonably infer that she received a lower grade because of her sex.

The belt-buckle incident gives the Court greater pause. Under Title IX, sexual harassment is a form of sex discrimination. *See, e.g.*, *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999). Whether a particular act qualifies as harassment "depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 651 (cleaned up). Here, Dykstra was a professor and Leyva was a student. It is not unreasonable to imagine that a female student would be uncomfortable with

a male professor showing her an item of clothing in a way that emphasizes his crotch. And one would expect a professor to recognize and avoid the appearance of impropriety, even if he had no underlying suggestive intent. In the interest of construing the pleadings in a light most favorable to Leyva, the Court assumes, without deciding, that Leyva has plausibly alleged sexual harassment with respect to the belt incident, and, therefore, sex discrimination. Accordingly, the Court will continue its analysis as to that portion of the claim after discussing the WLC election dispute.

Turning to the election dispute, there is no indication that any faculty member or student involved in the dispute acted with any sex-based animus. In fact, Leyva's allegations under this claim focus primarily on race, not sex. *See* Dkt. 2, at 16–19 (repeatedly noting that the students and faculty involved in the election dispute were white and that Leyva is Latina).

Leyva was given multiple opportunities to defend her election-related decisions to both faculty and peers, and both publicly and privately. Far from discriminating against her, both the Law School and the University appear to have opened their doors to Leyva, giving her full access to their conflict-resolution procedures. The fact that those procedures resulted in an outcome favorable to the two female complainants, and not to Leyva, does not, without more, give rise to a reasonable inference of sex discrimination.

In sum, Leyva has failed to show that the conduct of those involved in the election dispute constitutes sex discrimination. Thus, she cannot make the requisite showing under *Karasek* and this portion of her claim should be dismissed. In the Ninth Circuit, a claim should be dismissed without leave to amend only if the claim cannot be saved by

amendment. *See, e.g.*, *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009). Theoretically, Leyva could amend this claim to include facts sufficient to show sex discrimination. Thus, as will be outlined at the end of the order, the Court will grant Leyva leave to amend.

As for Leyva's experience in the Housing Clinic, the pleadings indicate that she experienced sex discrimination, but only with respect to the belt-buckle incident. Accordingly, the Court will continue its analysis on that point.

### b.  Substantial Control

The alleged harassment here came at the hands of a law professor in the context of a school-provided clinic. The Law School exercises substantial control over both Dykstra and the housing clinic. *See Davis*, 526 U.S. at 630 (finding that where harassment took place during school hours and school grounds, and where the harasser was subject to a school's disciplinary authority, the school had substantial control). Thus, this requirement is satisfied.

### c.  Severity, Pervasiveness, and Offensiveness

As noted above, to state a Title IX claim, a plaintiff must allege that the harassment she faced was so severe, pervasive, and objectively offensive that she was deprived of access to the educational opportunities or benefits provided by the school. *Karasek*, 956 F.3d at 1105. Leyva has not done so here. The belt-buckle incident constitutes a single instance of potential harassment. Without more, Leyva's allegations do not show the requisite pervasiveness. Nor has Leyva alleged—beyond conclusory statements—that the harassment she faced was sufficiently severe or objectively offensive.

ORDER - 11

Thus, the remainder of Leyva's Title IX claim falters under this severity requirement. Again, it is possible that Leyva could amend this claim to include facts sufficient to show sex discrimination. Thus, the Court will grant her leave to amend.

### 2. The Title VI Claim

In her second claim, Leyva alleges that the same actions discussed above constitute discrimination on the basis of race, color, and/or national origin in violation of Title VI of the Civil Rights Act of 1964. "To prove Title VI discrimination, a plaintiff must demonstrate that [she] was subjected to discrimination due to race, color, or national origin, by a program or activity receiving federal financial assistance." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1242 (9th Cir. 2021) (cleaned up). A private party seeking judicial enforcement of Title VI's nondiscrimination protections must prove intentional discrimination. *Id*.

Beginning again with the Housing Clinic, Leyva has not stated facts sufficient for the Court to draw a reasonable inference that she was denied opportunities and awards because of her race. *See Iqbal*, 556 U.S. at 678. There are myriad possible justifications *not* involving race for Dykstra's decision to give opportunities and awards to other Housing Clinic students. It is Leyva's job to plead facts sufficient for the Court to infer that a racial explanation outweighs these other possibilities. She has not done so. The same is true of class grades. Leyva asks the Court to infer racial animus from the fact that there were white students who received better grades than she. But this is not enough. The facts surrounding the belt-buckle incident are also devoid of racial elements. In summary, no aspect of the Housing Clinic allegations presents a sufficient basis from which the Court can infer that Leyva was discriminated against *because of* her race.

Turning to the election dispute, Leyva claims that the Law School's faculty entertained a complaint about the WLC's election procedures without sharing the evidence that accompanied the complaint and despite the fact that Leyva followed the same procedures administered by the former, white president. Dkt. 2, at 20. She also takes issue with the fact that the election results were changed despite her "sole authority to administer it," and the fact that the Law School resolved the complaints from the two WLC members faster than it resolved her complaint about how the election was handled. *Id.* at 21. She states baldly that "the stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to hide the Defendant's discriminatory animus." *Id.* But again, Leyva is asking the Court to infer animus from what appears to be rather benign conduct.

It may be true that Leyva followed the same election process as her white predecessor. But the fact that Leyva's election was challenged and her predecessor's was not does not, on its own, support an inference of racial discrimination.[3] Perhaps Leyva's WLC consisted of a more demanding and particular group of members. Perhaps the club's attitude towards allowing non-members to vote shifted between the two administrations. Perhaps the two complaining members dislike Leyva due to their experiences working together in club leadership—and not her race.[4] Based on the facts in the Complaint, the Court cannot reasonably infer racial animus where so many other more plausible explanations exist.

---

[3] A school has a right to enforce its constitution when a violation is brought to its attention, even if prior violations were never challenged.

[4] Leyva spends considerable time discussing her acrimonious relationship with the two complaining WLC members. *Id.* at 4–7.

Leyva's statements about the faculty's actions in changing the election results also fail to show racial animus, or even racial consideration. Accepting Leyva's allegations as true, Dean Samuels' grabbing of Leyva's computer and uploading of the voting data to the cloud seems impolite and invasive. And Leyva is justified in feeling confused and disappointed that the faculty members involved did not share with her the evidence submitted by the complaining students. Leyva is also justified in her disappointment that the faculty members modified the results of an election on which Leyva surely spent significant time and effort. But the only support Leyva offers for her position that these actions were motivated by racial bias are her conclusory statements. Such support is insufficient to maintain a claim. *See Iqbal*, 556 U.S. at 678.

Finally, the difference in resolution time between Leyva's complaint and the complaint of the two WLC members can be readily explained by the fact that, because Leyva alleged racial discrimination, her complaint had to be referred to OCRI, while the complaint of her peers could be handled entirely within the Law School.[5] Leyva herself seems to acknowledge this. *See* Dkt. 2, at 11 ("Dean Kalb's referral of Leyva's report of discrimination to OCRI resulted in a long delay of the decision on Leyva's appeal . . . ."). One can reasonably expect that adding an extra organization and layer of review to a review process will result in the extension of that process.

In sum, the Court cannot reasonably infer from Leyva's pleadings that the faculty

---

[5] For reference, Leyva alleges that the Law School issued a final decision on her election complaint seventy-five days after she filed it, despite the Law School's typical policy of resolving complaints within twenty days, and despite its rapid action on the complaint filed by the WLC members.

involved in the election dispute, or the Housing Clinic, discriminated against her because of her race. Thus, this second claim is insufficient. Nevertheless, the Court will grant Leyva leave to amend.

### 3. *The IHRA Claim*

In her third claim, Leyva alleges that the Law School's actions constitute discrimination on the basis of race, color, sex, and national origin in violation of the IHRA. She also asserts that she was retaliated against for engaging in activity protected under the IHRA. For the sake of clarity, the Court will briefly set forth the legal standards on which courts have relied when ruling on IHRA claims. It will then apply those standards to Leyva's allegations.

### a. Legal Standards

The IHRA prohibits discrimination against a person "because of, or on the basis of, race, color, religion, sex or national origin." Idaho Code § 67-5909. As it applies to educational institutions, it specifically prohibits discrimination against students "in the terms, conditions, and privileges of the institution[.]" *Id.* at § 67-5909(7)(a).

One of the express purposes of the IHRA is to "provide for execution within the state of the policies embodied in the federal Civil Rights Act of 1964[.]" Idaho Code § 67-5901(1). Both the Ninth Circuit and the Idaho Supreme Court have held that the language of the IHRA mirrors language from Title VII of the Civil Rights Act. *Johnson v. N. Idaho Coll.*, 278 P.3d 928, 933 (Idaho 2012) (citing *Johnson v. N. Idaho Coll.*, 350 Fed. App'x 110, 112 (9th Cir. 2009)). Accordingly, it is appropriate to rely on cases interpreting Title VII to guide interpretation of the IHRA. *See id.*; *Mendez v. Univ. Health Servs. Boise State*

*Univ.*, 409 P.3d 817, 822 (Idaho 2017) ("The IHRA's legislative intent permits Idaho courts to reference federal law in construing state provisions."). Further, although Title VII expressly encompasses employment situations, courts have held it to also apply in educational contexts involving instructors and students. *Johnson*, 278 P.3d at 933 ("[I]t is appropriate to apply the employer/employee analogy to the instructor/student dynamic when dealing with educational discrimination."). Considering the foregoing, the Court relies on both federal law interpreting Title VII, and Idaho law interpreting the IHRA, here.

Title VII prohibits sexual harassment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986). Courts recognize two general categories of sexual harassment: *quid pro quo* harassment[6] and hostile work environment—or here, educational environment—harassment. *See, e.g.*, *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007). Under a *quid pro quo* theory, a plaintiff must show that his or her supervisor explicitly or implicitly conditioned a benefit or the absence of a detriment upon acceptance of sexual conduct. *Id.* A prima facie case under a hostile educational environment theory consists of five elements: (1) the plaintiff was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's education and create an abusive educational environment; (4) the educational environment was subjectively and objectively abusive; and (5) the conduct was extreme enough to amount to a change in the terms and conditions of the plaintiffs education. *Id.* at 1054–55.

---

[6] *Quid pro quo* harassment is also sometimes called "tangible employment action" harassment. *Id.*

Title VII also prohibits retaliation against a student for complaining about harassment. To plausibly allege retaliation, a plaintiff must show that she engaged in protected activity under Title VII, that she was subject to an adverse educational action, and that there is a causal relationship between the activity and the adverse educational action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987); *see also Patterson v. State, Dep't of Health & Welfare*, 256 P.3d 718, 726 (Idaho 2011).

As the IHRA relates to racial discrimination, it appears that both Title VI and Title VII could be relevant to the Court's analysis. As discussed immediately above, Idaho courts regularly look to Title VII to interpret the IHRA. And as noted in the Court's analysis of the Title VI claim, Title VI *also* deals with racial discrimination—and in a way that is perhaps more relevant to Leyva's claim than Title VII.[7] The problem for Leyva is that the Court has already determined her claim to be inadequate under Title VI. *See* Section IV(B)(2). Thus, for purposes of this section, the Court will limit its racial discrimination analysis to Title VII.

A prima facie showing of racial discrimination under Title VII requires a plaintiff to show: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse educational action; and (4) similarly situated people outside of the class were treated more favorably or other circumstances surrounding the adverse action allow a court to reasonably infer discriminatory animus. *Mendez*, 409 P.3d at 823.

---

[7] Title VI deals expressly with educational contexts, while, under Title VII, the Court has to analogize employment contexts to educational contexts. *See Johnson*, 278 P.3d at 933.

ORDER - 17

b.  <u>Analysis</u>

Beginning with Leyva's sex discrimination claims, she has not alleged that Dykstra explicitly or implicitly conditioned the bestowal of a benefit or the withholding of a detriment upon Leyva's acceptance of sexual conduct. Thus, she has not alleged harassment under a *quid pro quo* theory. Under a hostile educational environment theory, assuming, without deciding, that Leyva has alleged facts sufficient to satisfy the first two requirements, she has not claimed that Dykstra engaged in conduct sufficiently severe, pervasive, objectively abusive, or extreme enough to create a hostile educational environment or to change the terms and conditions of Leyva's education. Thus, she has not sufficiently alleged sexual harassment. Leyva has also failed to sufficiently allege non-harassment sex discrimination for the same reasons discussed in the Court's Title IX analysis above. *See* Section IV(B)(1).

Leyva asserts that her lower grade in the Housing Clinic was "the product of retaliation for her reporting concerns about discrimination in the Housing Clinic" as well as due to her support for a local organization with which the clinic was contemplating cutting ties. Dkt. 2, at 24. She also claims that the Law School's delay[8] in resolving her election complaint constitutes retaliation. Again, a retaliation claim consists of a plaintiff engaging in protected activity, experiencing an adverse educational action, and demonstrating a causal relationship between the adverse action and the plaintiffs' activity. *Yartzoff*, 809 F.2d at 1375.

---

[8] Leyva alleges that the Law School issued a final decision on her election complaint seventy-five days after she filed it, despite the Law School's typical policy of resolving complaints within twenty days.

Beginning with the Housing Clinic allegation, the Court assumes that Leyva's reporting of her concerns about discrimination constitutes protected activity. In *Johnson*, the Supreme Court of Idaho suggested that the lowering of a grade may constitute an adverse educational action. 278 P.3d at 937–38. However, even assuming that to be true, the Court remains unable to reasonably infer from Leyva's complaint that there is a causal relationship between her reporting and the grade she received. Leyva has not persuasively alleged that she was entitled to a better grade nor that she would have received it save for her report. Thus, her retaliation claim as to the Housing Clinic events fails.

Moving to the delay in resolving Leyva's election complaint, the Court cannot classify this delay as an adverse educational action. In *Hathaway v. Bd. of Regents of Univ. of Idaho*, the Supreme Court of Idaho stated that, under the IHRA, adverse employment actions "include significant changes in employment status" like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 310 P.3d 315, 325 (2013) (cleaned up). The court also stated that "mere inconveniences" like ostracism in the workplace or simply being "kept out of the loop" did not constitute adverse employment actions. *Id.*

The Court notes the inherent difficulty in analogizing between employment and educational contexts. Nevertheless, it has no difficulty holding that a delay of a month or two, on its own, is more akin to the "mere inconveniences" that fell short of the mark in *Hathaway*, than to the "significant changes" that qualified as adverse employment actions. The significant changes listed in *Hathaway* each fundamentally alter both a persons' standing in their organization and the benefits they receive from that organization. The

ORDER - 19

delay here had no such effect. Nobody likes waiting—particularly not when one has a personal interest in the resolution of the matter being delayed. But the delay Leyva alleges does not constitute an adverse educational action.

Further, even if the Law School's delay in resolving Leyva's complaint *was* an adverse educational action, the Court cannot reasonably infer a causal relationship between Leyva filing the election complaint and the Law School delaying its resolution thereof. As Leyva acknowledges, her complaint had to be referred to OCRI. Dkt. 2, at 11. As already discussed, this likely delayed resolution of the complaint more than any other factor. Accordingly, this retaliation claim also fails.

Finally, Leyva's complaint does not state a prima facie case of racial discrimination under Title VII. Beginning with her Housing Clinic grade and opportunities, assuming the first three racial-discrimination factors to be satisfied, the Court has already made clear that Leyva's complaint does not give rise to a reasonable inference of discriminatory animus. Turning to the election dispute, the modification of the WLC election results is not an adverse educational action. It had no formal impact on Leyva's status at the Law School. Leyva alleges that numerous negative social consequences resulted from the election dispute, *id.* at 6–13, but these appear similar to the ostracism faced by the plaintiff in *Hatheway*, which fell short of the "adverse action" standard. 310 P.3d at 325. And, as already discussed, the election dispute does not give rise to a reasonable inference of racial discrimination. Accordingly, Leyva's racial discrimination claim fails under Title VII.

In summary, Leyva's claim under the IHRA fails largely for the same reasons her other claims failed—she is asking the Court to infer racial and sexual discrimination from

conduct that is more readily and reasonably explained in other ways. As with her other claims, the Court will grant Leyva an opportunity to amend her IHRA claim.

## V. CONCLUSION

Because Leyva cannot pay the Court's filing fee without making unacceptable sacrifices, the filing fee is WAIVED. However, Leyva has failed to state a claim upon which relief may be granted. The Court will grant Leyva thirty (30) days from the issuance of this order to file an amended complaint remedying the deficiencies outlined herein. If she fails to do so, the Court will dismiss this case WITH PREJUDICE.

## VI. ORDER

1. Leyva's Application to Proceed in Forma Pauperis (Dkt. 1) is GRANTED.

2. Leyva must file an amended complaint within thirty (30) days of issuance of this order.

   a. Failure to file, or failure to remedy the deficiencies the Court has highlighted herein, will result in DISMISSAL WITH PREJUDICE.

DATED: September 10, 2024

David C. Nye
Chief U.S. District Court Judge