UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSA MARIA LEYVA,<br><br>                    Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF IDAHO,<br><br>                    Defendant. | Case No. 1:24-cv-00263-DCN<br><br>**SUCCESSIVE REVIEW ORDER** |

## I.  INTRODUCTION

On September 10, 2024, the Court issued an Order dismissing this case without prejudice (hereinafter "Initial Review Order"). Dkt. 4. In the Initial Review Order, the Court granted Plaintiff Rosa Maria Leyva's Application for leave to proceed *in forma pauperis*. *Id.* at 6. However, after screening Leyva's Complaint pursuant to 28 U.S.C. § 1915(e)(2), the Court deemed it insufficient to state a claim. *Id.* at 7–21. The Court granted Leyva leave to file an amended complaint within thirty days of the Court's Order. *Id.* at 21. After requesting and receiving a brief extension (Dkts. 5, 6), Leyva timely filed her Amended Complaint on November 1, 2024. Dkt. 7.

The Court has conducted a successive review of Leyva's Amended Complaint and finds she has satisfied the requirements of 28 U.S.C. § 1915(e)(2) with respect to her: (1) Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") claim involving Professor Jason Dykstra's alleged sexual harassment and discrimination; (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* ("Title VI") claim regarding the University of Idaho College of Law's (the "Law School") racial discrimination after the

Women's Law Caucus ("WLC") election; and (3) Idaho Human Rights Act, Idaho Code §

67-5901 *et seq*. ("IHRA") claim with respect to Dykstra's alleged sexual harassment and

discrimination and the Law School's purported racial discrimination after the WLC

election.[1]

## II.  BACKGROUND

Leyva is an Idaho resident who recently graduated from the Law School. During her

final year at the Law School, Leyva served as the first Latina president of the WLC. She

also participated in the Law School's Housing Clinic, a class wherein law students work

with local organizations and individuals looking for legal aid related to housing.

In her Amended Complaint, Leyva alleges the Law School discriminated and

retaliated against her on the basis of her sex, race, national origin, and color, in violation

Title IX, Title VI, and the IHRA. *See* Dkt. 7. Leyva's claims arise out of the Law School's

actions after a WLC election she administered as the WLC's president, and her treatment

by a male professor during her participation in the Housing Clinic.

### A.  WLC Election

At the end of each school year, the WLC holds an election to choose club officers

for the following year. Under the WLC Constitution, the club's president plays a significant

role in election administration. Leyva's Amended Complaint explains she administered the

---

[1] As further explained below, Leyva's IHRA retaliation theories—with respect to both the Housing Clinic and the WLC election—are insufficient to state a claim and are accordingly dismissed. In addition, the portions of Leyva's Title IX claim involving the WLC election, and her Title VI claim regarding the Housing Clinic, are dismissed. As outlined in the Court's Order, *infra* Section VI, Leyva may choose between again attempting to amend, or foregoing further amendment and proceeding with the narrowed claims outlined herein.

spring 2023 WLC election using the procedure that had been taught to her by prior WLC officers, and which she understood was authorized under the WLC Constitution. More specifically, consistently with the historical practice of WLC elections and the procedure of all past presidents of the WLC—each of whom were white—Leyva ensured all Law School student votes were counted regardless of whether the voter was a "member" of the WLC, or whether the voter had previously come to a WLC meeting or participated in WLC events.

When Leyva administered the 2023 WLC election, two white female students complained (once the results were announced) that Leyva had committed voting fraud because she allowed individuals who were not members of the WLC to vote. Leyva does not deny this, but explains the standard procedure was to allow all Law School students to vote in WLC elections. Leyva also highlights the WLC has no formal membership criteria, so excluding non-members from voting would have been impossible. In addition, Leyva contends she had prior run-ins with the complaining students, both of whom were also part of the WLC's leadership. According to Leyva, during their time in Law School together, the two complaining white students displayed racial animosity towards her by making stereotypical remarks about her during class and intentionally excluding her from planning WLC events.

Leyva alleges the white complaining students also displayed racial animosity towards her by holding a meeting with faculty during which she was mocked and humiliated. Specifically, during the dispute over the WLC election, one of the complaining students requested a meeting with the WLC's executive board members and faculty advisors, as well

as with Leon Samuels, the Law School's Dean of Students. During the meeting, Leyva alleges she was falsely accused of telling students that the WLC's Constitution did not matter. Leyva contends she was also both generally stereotyped and mocked by the white complaining students, and accused of intentionally violating the WLC's Constitution. Leyva suggests neither Samuels nor the Faculty Advisors present at the meeting (Law School Professors Kathryn Ball and Wendy Couture) did anything to stop the white students' unfounded accusations against her.

In response to the white students' complaint, an executive board member, Laegan Meyers, emailed Leyva, "demanding that [Leyva] turn over the secret Google voting poll" for review. Dkt. 7, ¶ 45. Leyva believed this was wrong for several reasons, but particularly because no other WLC president had ever been forced to turn over sensitive voting information. When Ball later "demanded" that Leyva turn over the voting results, Leyva did so immediately via email. *Id*. With her email, Leyva provided Ball and Samuels with information regarding the WLC custom of permitting all Law School students to vote in WLC elections, including the sections of the WLC Constitution that authorized this practice.

At some point after the meeting, Samuels reviewed the voting data, along with screenshots of text messages and social media posts submitted by the white complaining students. At the end of his review, Samuels concluded that only votes by WLC members should have been counted. Samuels modified the election results accordingly, which resulted in the white candidate—preferred by the white complaining students—becoming the new WLC president.

Leyva subsequently scheduled an "urgent meeting" with the Dean of the Law

School, Johanna Kalb, to discuss Samuels' decision. Dkt. 7, ¶ 57. During the meeting, Leyva alleges Kalb repeatedly cut her off when she tried to explain the history of allowing all Law School students to vote in WLC elections, and exasperatedly questioned whether Leyva "really wanted her to investigate past elections." *Id*. Leyva maintains Kalb also repeatedly highlighted "all the papers she had written about minorities," as she simultaneously ignored Leyva's concerns about Samuels' reversal. *Id*.

On or about April 25, 2023, Ball and Couture told Law School students the WLC election result had been modified. Ball and Couture stated the modification was made pursuant to the "ordinary Dean of Students' review process" and because votes from Law School students who were not members of the WLC had "inadvertently" been counted. *Id*., ¶ 58. Ball and Couture also stated: "We understand it may have been past practice to include votes from anyone in the student body in calculating WLC election results. However, this contravenes the Constitution, which limits voting to 'general membership' and 'current members.'" *Id*.

Leyva highlights the Law School swiftly reversed the WLC election within 24-hours of the white students' complaint. *Id*., ¶ 64. By contrast, the Law School purportedly ignored Leyva's repeated attempts to both defend the election and to illustrate the WLC's custom had always been to allow non-member Law School students to vote. Leyva emphasizes Ball and Couture recognized this custom in their announcement about the election modification, but nevertheless overturned the 2023 WLC election without allowing Leyva to pursue the process the student handbook required to address allegations of student club voting problems. *Id*., ¶¶ 58, 64.

Leyva subsequently tried to "appeal"[2] Samuels' decision, suggesting the actions of the white faculty members in fielding and promptly responding to the complaint submitted by the two complaining white students were motivated by racial discrimination. *Id.*, ¶ 60. On May 3, 2023, Kalb received Leyva's appeal via email. Because it involved a claim of discrimination, Kalb referred the appeal to the University of Idaho's Office of Civil Rights and Investigations ("OCRI"). Upon review, OCRI informed Leyva there was no articulable basis to substantiate her claims of discrimination. Apparently, the issue was then returned to the Law School. After her own review, Kalb informed Leyva she could not find Samuels had erred in reversing the election. Kalb so notified Leyva on July 17, 2023, 38-days after OCRI issued its decision, and 75-days after Leyva submitted her appeal. *Id.*, ¶ 65.

Leyva suggests the discrepancy between the mere 24-hours it took the Law School to act on the white students' complaint, versus the more than a month—after OCRI issued its decision—the Law School delayed in deciding her appeal of the election reversal, illustrates racial bias. *Id.*, ¶¶ 59, 64–65. Leyva also alleges "because of a complaint made by white students to white faculty about an election administered by a Latina student, the election results were overturned . . . for the first time in the Idaho WLC's history based on a practice that white students had followed for years without complaint." *Id.*, ¶ 68. Leyva maintains this result occurred because the Law School faculty affirmed and ratified the discriminatory actions of the complaining white students. *Id.*

In her Amended Complaint, Leyva alleges that during the period between the WLC

---

[2] The Amended Complaint does not identify the process Leyva used to appeal Samuels' decision.

election, the complaining students' challenge to the election, and her appeal of Samuels' decision to overturn the election, Honor Court proceedings were initiated against her based on the white students' allegation that she had fraudulently administered the election.[3] Leyva explains Honor Court proceedings can result in serious consequences for students, including the denial of a degree. Leyva highlights she faced such proceedings while she was simultaneously defending her actions as WLC president, preparing to graduate, studying for final exams, and preparing to take the Bar exam. As a result of the Honor Court proceedings, Leyva was forced to attend a probable cause hearing, after which the complaint against her was ultimately dismissed. Leyva alleges the proceedings were brought and maintained as a result of race and gender-based animus.[4] Dkt. 7, ¶ 70.

Leyva's Amended Complaint also adds details regarding the alleged racial discrimination she suffered at the hands of various Law School faculty members during the WLC election and throughout her three years of law school. For instance, Leyva alleges Samuels and Kalb treated her extraordinarily unfairly during the WLC election dispute and allowed the Honor Court proceedings to be brought against her although they recognized she had conducted the election in conformance with both longstanding custom and at the instruction of her white predecessors. *Id.*, ¶¶ 23, 28–29, 38, 48, 51, 56–59, 68–71. Together with Samuels and Kalb, Leyva maintains Ball and Couture "took extraordinarily swift action

---

[3] The scope of the Law School's involvement in initiating and facilitating the Honor Court proceedings is not entirely clear in the Amended Complaint. At this early stage of the proceedings, the Court assumes the Law School played a role in the Honor Court proceedings.

[4] As further explained below, Leyva does not identify any facts to suggest her disparate treatment—with respect to the WLC election—was motivated by gender discrimination.

to consider the white students' complaints and to overturn the WLC election." *Id.*, ¶ 59. Leyva suggests such faculty's participation in overturning the election was contrary to the WLC Constitution, beyond their authority, procedurally defective, and motivated by racial discrimination. *Id.*, ¶ 60.

Leyva's Amended Complaint also alleges Ball racially discriminated against her during her first year of Law School when Ball both criticized Leyva's legal writing without providing specific feedback, and dismissed Leyva's allegations of racial discrimination which were later sustained. With respect to the latter claim, Leyva explains her first year Contracts professor, John Miscione, treated her rudely and dismissively, such as by reprimanding her for "participating too much in discussion, even though several white students spoke more." *Id.*, ¶ 40. Leyva contends that when, as a result of such alleged discrimination,[5] Miscione awarded her a final grade that was artificially low, she addressed her concerns with Ball. In response, Leyva maintains Ball "gaslit" her, suggested she was "imagining discrimination," and tried to convince her to "drop the matter." *Id.*, ¶ 41. Instead of dropping the matter, Leyva petitioned for review of her grade by the Law School's Academic Hearing Board ("AHB"). Leyva alleges the AHB found "evidence of bias in the grading process," sustained her complaint, recommended Leyva's grade be raised, and referred the matter to OCRI.[6] *Id.*, ¶ 42.

---

[5] To support her claim of racial discrimination, Leyva explains she was one of only two Latinas in the Contracts class of approximately 80 students, and was the only student who clearly presented as Latina. Dkt. 7, ¶ 40. As noted, she also highlights she was criticized her for speaking too much in class, while white students who spoke more were not. Although Leyva suggests Miscione's alleged discrimination was also motivated by her gender, she does not identify any facts to support this contention. *Id.*

[6] Leyva contends she "declined to pursue the OCRI matter because she wished that the school raise [her]

### B.  Housing Clinic

As noted above, Leyva participated in the Law School's Housing Clinic during her final semester. The clinic was supervised and directed by Professor Jason Dykstra. Leyva highlights she was both the only woman and the only student of color who participated in the clinic that semester. *Id*., ¶ 77. In her Amended Complaint, Leyva highlights during the first week of class, Dykstra complained "about another woman attorney that he claimed attacked him for not giving her organization credit for a project that he and that attorney had worked on together." *Id*. Leyva alleges the director of the Housing Clinic subsequently confided in Leyva that Dykstra and a white male student "had spoken in a sexist manner about a woman politician." *Id*., ¶ 80.

All students in the Housing Clinic were required to provide support to Jesse Tree, a social services organization that works to prevent eviction and homelessness in Boise. Although Jesse Tree's eviction manager praised her as the best law student working with the organization that semester, Leyva highlights the award for best clinic student was given to a white male student. *Id*., ¶ 82. Leyva suggests the student who received the award did not actually volunteer for Jesse Tree, and other male students in the course also failed to provide Jesse Tree with any legal representation. *Id*., ¶¶ 78, 81–82, 84.  In addition, Dykstra allegedly gave the other students in the clinic more opportunities, graded them more favorably and leniently, and welcomed their class participation while ignoring or dismissing Leyva's legal opinions and input. *Id*., ¶¶ 78–82. Dykstra also insultingly instructed Leyva to "be

---

grade, but the school registrar declined to do so." *Id*., ¶ 42.

professional" when speaking with clients—even though she was always professional—but never told the male students to be professional. *Id.*, ¶ 83

Dykstra also purportedly "expressed feelings of anger and resentment" towards Professor Jessica Long during class.[7] *Id.* Dykstra later told the class he was considering cutting ties with Jesse Tree for reporting him to Long.[8] Dykstra allegedly asked the Housing Clinic students what they thought about this. After Leyva openly and strongly disagreed with cutting ties, Dykstra purportedly lowered her Housing Clinic grade in retaliation. *Id.*, ¶ 86.

As in her initial Complaint, Leyva's Amended Complaint also alleges in one instance, Dykstra told her to look at his belt and pulled his belt buckle towards her in a manner that "displayed his crotch" towards Leyva and made her feel uncomfortable and embarrassed. *Id.*, ¶ 85. In her Amended Complaint, Leyva explains the latter incident occurred during an apparently private meeting Dykstra required her to attend. *Id.*, ¶ 84–85. In addition, Leyva's Amended Complaint alleges Dykstra made repeated unreturned phone calls to her personal phone after making the aforementioned gesture. *Id.*

### III. LEGAL STANDARD

The Court is required to screen complaints brought by litigants who ask to proceed *in forma pauperis*. 28 U.S.C. § 1915(e)(2). The Court must dismiss a complaint, or any claim, that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

---

[7] Although the Amended Complaint does not specifically so state, it appears Long was the director of the Housing Clinic.

[8] The Amended Complaint does not identify specifically what Jesse Tree reported about Dykstra to Long.

*Id.* at §§ 1915(a)(1) & (e)(2). During its review, the Court must accept all allegations of material fact as true and construe a complaint liberally, giving a pro se plaintiff the benefit of any doubt. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Even so, plaintiffs—whether represented or not—must articulate their claims clearly and allege sufficient facts to support review of each claim. *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).

A complaint fails to state a claim for relief under Rule 8 of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court to plausibly "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("*Iqbal*").

## IV. DISCUSSION

Pursuant to 28 U.S.C. § 1915(e)(2), the Court evaluates each of Leyva's three claims against the Law School in light of her amended allegations.

### A.  Title IX Claim

In her first claim, Leyva alleges the Law School's conduct—with respect to the WLC election and her participation in the Housing Clinic—constitutes both sexual discrimination and a hostile educational environment in violation of Title IX. Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This prohibition applies to both discrimination on the basis of sex and sexual harassment.

SUCCESSIVE REVIEW ORDER - 11

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176–77 (2008); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643–44 (1999).

A plaintiff bringing a Title IX sex discrimination claim must plead: (1) the defendant educational institution receives federal funding; (2) the plaintiff was excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity; and (3) the latter occurred on the basis of sex. *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020). After alleging the defendant is a recipient of federal financial assistance and that the plaintiff was harassed "because of" his or her sex, a plaintiff bringing a Title IX harassment claim must provide sufficient facts to support five elements: (1) the school "exercised substantial control over both the harasser and the context in which the known harassment occurred"; (2) the harassment suffered was "so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school"; (3) "a school official with authority to address the alleged discrimination and to institute corrective measures on the school's behalf" had actual knowledge of the harassment; (4) the school was deliberately indifferent to the harassment; and (5) the school's deliberate indifference subjected the plaintiff to harassment or made the plaintiff vulnerable to it. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1104, 1105 (9th Cir. 2023) (cleaned up).

As outlined below, the Court finds Leyva's Amended Complaint adequately states a Title IX claim with respect to her allegations regarding the Housing Clinic. The Court accordingly turns first to such allegations. However, as explained in the Court's Initial Review Order and below, Leyva's Amended Complaint again fails to plausibly allege a

Title IX claim with respect to the WLC election.

    1.  *Housing Clinic*

    a.  <u>Discrimination</u>

In its Initial Review Order, the Court explained Leyva alleged the University of Idaho receives federal financial assistance, but failed to identify facts to suggest she was discriminated against "because of" her sex. For instance, with respect to her experience in the Housing Clinic, Leyva's initial Complaint summarily declared she was discriminated against on the basis of her sex because male students were selected to speak on a talk show, moderate an event, and receive an award. The Court noted that such opportunities can, by their very nature, only be awarded to a very limited number of students. As such, the mere fact that Leyva was not one of those lucky few did not suggest she was denied such opportunities because of her sex. Dkt. 4, at 8–9. In addition, despite her suspicions that Dkystra *unfairly* gave the male students in the Housing Clinic higher grades, Leyva's initial Complaint did not include allegations to support this conclusion. *Id*. at 9. The Court held it could not infer Leyva received a lower grade because of her sex based on her suspicions alone. *Id*.

Because her Amended Complaint identifies facts which support her belief that Dykstra's actions were motivated by gender bias,[9] Leyva may proceed with her Title IX discrimination claim with respect to the Housing Clinic. For instance, Leyva's Amended Complaint explains Dykstra repeatedly spoke negatively about women—both within and

---

[9] Although Title IX uses the term "sex," this term may be used interchangeably with "gender" in the Title IX context. *Schwake*, 967 F.3d at 946 n. 5.

outside her presence—while she was his Housing Clinic student. During the first week of the course, Dykstra complained about a female attorney who purportedly "attacked him" for not giving her credit for a project the two had worked on together. Dkt. 7, ¶ 77. Later in the semester, the director of the Housing Clinic confided in Leyva that Dykstra and a male student in the Housing Clinic had made sexist remarks about a female politician. *Id*., ¶ 80. Dykstra also expressed feelings of "anger and resentment" towards Long for calling him out "on his poor work" in the Housing Clinic—both in a private meeting with Leyva—and to the entire Housing Clinic class. *Id*., ¶ 84. Further, Dykstra instructed Leyva "to be professional" when speaking to clients, but never told the male students in the Housing Clinic to do so. *Id*., ¶ 83. At the same time, Dykstra frequently asked only the male students in the clinic what they thought about certain legal issues, while ignoring or dismissing Leyva's attempts to provide her own legal opinions and input. *Id*.

Although Leyva's purported lack of opportunities and lower grade in the Housing Clinic may have been unrelated to her sex, the Ninth Circuit has held sex discrimination "need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." *Schwake*, 967 F.3d at 948 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)). Thus, Dykstra's apparent disparate treatment of Leyva, when coupled with her allegations that: (1) Jesse Tree's eviction program manager praised her as the best law student working with the organization that semester; (2) although all Housing Clinic students were required to provide Jesse Tree with legal support, the male student who won the award for best Housing Clinic student failed to provide Jesse Tree legal representation, as did the other male students in the course; (3) despite such facts, solely male students were given As

in the course, offered various opportunities, and given the award for the best student in the course; (4) she was both the only female and the only student in the Housing Clinic who did *not* receive an A in the course; and (5) as outlined below, Dykstra's alleged sexual harassment, plausibly suggest Dykstra withheld opportunities from Leyva and graded her unfairly *because of* her sex. Dkt. 7, ¶¶ 78, 81–86. With respect to the Housing Clinic, Leyva's Amended Complaint accordingly states a colorable discrimination claim under Title IX. *Schwake*, 967 F.3d at 946.

    b.  <u>Harassment</u>

As the Court recognized in its Initial Review Order, the belt-buckle incident is concerning. Dkt. 4, at 9–10. As his student, it is understandable Leyva felt uncomfortable when Dykstra told her to look at his belt buckle while gesturing in a way that emphasized his crotch. In addition, the Court explained one would expect a professor to recognize and avoid the appearance of impropriety, even if he had no underlying suggestive intent. *Id*. at 10. The Court accordingly held Leyva had plausibly alleged she was harassed because of her sex. *Id*. at 11. The Court also explained Leyva had adequately alleged the Law School exercised substantial control over both Dykstra and the Housing Clinic. *Id*. (citing *Davis*, 526 U.S. at 630). Yet, because the belt-buckle incident constituted a single instance of potential harassment, the Court determined Leyva had not alleged the requisite pervasiveness needed to establish the second element of her harassment claim. *Id*. (citing *Karasek*, 956 F.3d at 1105).

Leyva's Amended Complaint adds sufficient allegations to clear this hurdle. Specifically, the Amended Complaint explains Dykstra made the aforementioned

inappropriate gesture during a private meeting he required Leyva to attend. Dkt. 7, ¶¶ 84–85. That Dykstra purportedly made a sexually suggestive gesture when Leyva was isolated and vulnerable compounds the objective offensiveness of the incident. As discussed above, Leyva's Amended Complaint also alleges Dykstra repeatedly denigrated women in her presence, including another female attorney he had worked with, Long, and Leyva herself. *Id*., ¶¶ 15, 77, 83–84. Concerningly, Leyva's Amended Complaint also explains Dykstra repeatedly attempted to reach her via her cell phone after the belt-buckle incident.[10] *Id*., ¶ 86. Although such calls may have innocuous, it seems highly inappropriate for a male professor to attempt to contact his female student on her personal phone, particularly when coupled with the sexually suggestive gesture Dykstra purportedly made during his private meeting with Leyva.

In sum, Leyva's allegations regarding the belt-buckle incident, Dykstra's demeaning comments about Leyva and other women, Dykstra's mistreatment of Leyva during class, and Dykstra's repeated unreturned phone calls, together satisfy the pervasiveness element of a sexual harassment claim with respect to Leyva's allegations regarding the Housing Clinic. The Court turns to the remaining three elements required to state a harassment claim under Title IX.[11] Leyva alleges the Law School had actual knowledge of Dykstra's alleged harassment because she reported Dykstra's actions to the coordinator of the Housing Clinic. *Id*., ¶ 87. Leyva also filed a complaint based on Dykstra's actions with the Idaho Human

---

[10] Leyva notes she never answered nor returned Dykstra's calls. *Id*.

[11] The Court did not address such elements in its Initial Review Order because, unlike her Amended Complaint, Leyva's initial Complaint failed to adequately allege Dykstra's purported harassment was sufficiently severe or objectively offensive. Dkt. 4, at 11.

Rights Commission. *Id.* Upon the filing of a complaint, the Idaho Human Rights Commission is required to promptly serve a copy of the complaint on the Respondent—here the Law School—by personal delivery, mail, email, or facsimile. Idaho Admin. Code R. 45.01.01.300; *see also* https://humanrights.idaho.gov/idaho-law/contexts/file-a-complaint ("A complaint is served immediately upon the organization, so they have an opportunity to know exactly what accusations are being made and to explain their side of the story."). Because she apparently notified the Law School about Dykstra's conduct both directly by reporting it to the Housing Clinic's coordinator, and indirectly through the Idaho Human Rights Commission, Leyva has plausibly alleged the Law School had actual knowledge of her alleged harassment.

Leyva also alleges the Law School was deliberately indifferent to Dykstra's alleged harassment because it neither investigated nor took *any* measures to address such conduct. Dkt. 7, ¶ 92. The Law School apparently did not interview Leyva, Dykstra, or any other students, and seems to have completely ignored Leyva's concerns. Finally, given Dykstra's alleged discriminatory treatment of Leyva, as well as his sexist comments, sexually suggestive gesture during a private meeting he required Leyva to attend, and repeated unreturned phone calls, the Law School's inaction appears to have made Leyva vulnerable to continuing harassment. *Karasek*, 956 F.3d at 1105.

In short, when liberally construing her Amended Complaint, the Court concludes Leyva has plausibly alleged a Title IX harassment claim with respect to the Housing Clinic.

### 2. *WLC Election*

The same cannot be said regarding Leyva's WLC election allegations. As in her

initial Complaint, Leyva's Amended Complaint does not identify *any* facts to suggest a Law School faculty member, or any student involved in the WLC election dispute, acted with sex-based animus. In fact, Leyva's allegations regarding the WLC election— including her amended allegations with respect to Ball, Couture, Samuels, and Kalb— focus solely on racial discrimination, not sexual discrimination. *See, e.g.*, Dkt. 7, at ¶¶ 10– 13, 22–25, 28–50, 56–61, 65–70 (repeatedly suggesting the white students and white faculty involved in the election dispute discriminated against her because of her race).

In addition, with the exception of Dykstra, Leyva's claims of discrimination by fellow students and faculty uniformly involve Leyva's unfair treatment by, or in favor of, white female students. *Id.* Without more, neither the fact that the WLC election dispute resulted in an outcome favorable to the two female complainants, nor that female students were purportedly favored over Leyva, give rise to an inference of sex discrimination.[12]

Leyva's Amended Complaint accordingly fails to plausibly allege that those involved in the WLC election dispute discriminated against or harassed her *because of* her sex. Thus, Leyva cannot make the requisite showing under *Karasek*, 956 F.3d at 1105, and the portion of her Title IX claim involving the WLC election is dismissed.

### B. Title VI Claim

In her second claim, Leyva alleges the WLC election and Housing Clinic allegations discussed above constitute discrimination on the basis of race, color, and/or national origin in violation of Title VI. To establish a Title VI claim, Leyva must allege: (1) she was an

---

[12] As explained below, such allegations do support Leyva's amended Title VI claim.

"intended beneficiary of the federally-funded program the defendants participated in"; and (2) the defendants intentionally discriminated against her in violation of the statute. *Clarke v. Upton*, 703 F. Supp. 2d 1037, 1050 (E.D. Cal. 2010) (cleaned up).

As mentioned, Leyva alleges the University of Idaho receives federal financial assistance and that she was an intended beneficiary of this program as a Law School student. Dkt. 7, at ¶¶ 17, 19. While the Court still finds she has not shown she suffered racial discrimination in the Housing Clinic, Leyva's Amended Complaint plausibly alleges the Law School subjected her to intentional racial discrimination with respect to the WLC election.

### 1. Housing Clinic

Beginning again with the Housing Clinic, Leyva has not identified sufficient facts for the Court to draw the reasonable inference that she was disparately treated because of her race. Unlike her Title IX claim, which provides concrete details to suggest she was discriminated against and harassed because of her sex, Leyva asks the Court to infer racial animus simply because there were white students in the Housing Clinic who were given more opportunities or received better grades than she. *Id.*, ¶¶ 78–80, 100.b. But this is not enough. *Iqbal*, 556 U.S. at 678 (explaining a complaint which pleads facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" ) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2013)). Without more, Leyva's personal belief that her lack of opportunities and B+ grade in the Housing Clinic were racially motivated is conclusory and is of no probative force. *Joseph v. Boise State Univ.*, 998 F. Supp. 2d 928, 944 (D. Idaho 2014). Leyva's

allegations regarding Dykstra's alleged sexual harassment are also devoid of racial elements. Dkt. 7, ¶¶ 84–86.

In short, Leyva's Housing Clinic allegations do not present a sufficient basis from which the Court can infer she was discriminated against *because of* her race. Leyva's Title VI claim with respect to the Housing Clinic is accordingly dismissed.

### 2. *WLC Election*

In its Initial Review Order, the Court determined Leyva's allegations about the WLC election, the white faculty's actions in overturning the election, and the circumstances of Leyva's subsequent appeal did not, on their own, support an inference of racial discrimination. Dkt. 4, at 13–14. For instance, the Court explained the WLC election could have been challenged because Leyva's WLC consisted of a more demanding and particular group of members than those in the past, or because the club's attitude shifted between administrations, or simply because the two WLC members who challenged the election disliked Leyva as a result of their experiences working with her in club leadership, and not because of her race.[13] *Id*. The Court held it could not reasonably infer racial animus where there were so many plausible explanations for the WLC election challenge which had nothing to do with race. *Id*.

In addition, the Court held Leyva's statements about the white faculty member's actions in overturning the election also failed to show racial discrimination because, although such conduct may have been distressing or disappointing, Leyva did not identify factual

---

[13] Leyva's initial Complaint detailed her acrimonious relationship with the two complaining WLC members. Dkt. 2, ¶¶ 18–20.

support for her position that such actions were motivated by racial bias. *Id*. at 14 (citing *Iqbal*, 556 U.S. at 678). Further, while Leyva challenged the difference between the Law School's nearly immediate reversal of the WLC election at the behest of the white complaining students, and the more than two months it took the Law School to process and deny Leyva's appeal, the Court noted the difference in resolution time was readily explained by the fact that, because Leyva alleged racial discrimination, her complaint had to be referred to OCRI, while the complaint of her peers was handled entirely within the Law School. Dkt. 4, at 14. In fact, Leyva's initial Complaint itself maintained that Kalb's referral of Leyva's appeal to OCRI "resulted in a long delay of the decision on Leyva's appeal[.]" Dkt. 2, ¶ 39. Ultimately, because her initial Complaint consisted solely of conclusory allegations of racial discrimination, the Court held it could not reasonably infer that the faculty involved in the election dispute discriminated against Leyva because of her race. Dkt. 4, at 13–15

The more detailed allegations in Leyva's Amended Complaint advance her racial discrimination claim from merely possible to plausible. For instance, Leyva alleges she was racially discriminated against by Ball—a key figure in the election dispute—long before the WLC election. Specifically, Leyva alleges Ball summarily dismissed Leyva's allegations of racial discrimination by Miscione, her first year Contracts professor. Dkt. 7, ¶¶ 40–41. When Miscione chastised Leyva for "participating too much in discussion, even though several white students spoke more," and awarded Leyva "a final grade that she believed was artificially low" as the result of alleged racial discrimination, Leyva raised her concerns with Ball. *Id*. Ball purportedly brushed off Leyva's complaint and suggested she was imagining discrimination. *Id*. However, when Leyva petitioned for review of her

grade, the AHB found "evidence of bias," recommended that Leyva's grade be raised, and referred the matter to OCRI. *Id*., ¶ 42.

Later, during the WLC election dispute, Leyva suggests she was humiliated and mocked during a meeting with Samuels, Ball, Couture, and the two white students who had challenged the election. *Id*., ¶ 38. Leyva maintains Samuels, Ball, and Couture not only allowed the white students to call her names and accuse her of violating the WLC Constitution, but also subsequently helped the white students take over some of Leyva's duties as WLC president. *Id*., ¶¶ 38, 43. Leyva alleges the only difference between her and the two complaining students—who were assisted and supported by the white faculty in swiftly challenging and overturning the election—is her race. *Id*., ¶¶ 22–24, 38, 45, 59.

Leyva also alleges in her Amended Complaint that, although Ball and Couture admitted the WLC's past practice was to include votes from member and non-member students in their announcement changing the WLC election result, the election she administered—as the first Latina president of the WLC—was immediately challenged and overturned because she allowed non-member Law School students to vote. *Id*., ¶¶ 56, 58–59, 68, 70. Perhaps most significantly, Leyva's Amended Complaint explains that although she followed the policy and practice taught to her by her white predecessors, the WLC election she oversaw was not only overturned, but Honor Court proceedings were also initiated against for purportedly fraudulently administering the election. *Id*., ¶¶ 29, 32, 44, 68–71. Leyva alleges the disciplinary proceedings were brought and maintained against

her due to racial animus. *Id.*, ¶ 70.[14]

In sum, that the election Leyva oversaw was not only promptly overturned at the behest of the white complaining students, but Leyva was also allegedly humiliated and mocked, stripped of her duties as WLC president, and subjected to disciplinary proceedings—simply for following the custom and practice of her white predecessors—plausibly suggests she was intentionally subjected to racial discrimination. Leyva's Title VI claim may accordingly proceed with respect to her allegations regarding the WLC election.

## C. IHRA Claim

In her third claim, Leyva alleges the Law School's actions constitute discrimination on the basis of race, color, sex, and national origin in violation of the IHRA. Leyva also contends she was retaliated against for engaging in activity protected under the IHRA. The Court outlined the standards applicable to an IHRA claim in its Initial Review Order, and incorporates such analysis by reference. Dkt. 4, at 15–18.

As above, the Court first considers whether Leyva has adequately alleged an IHRA claim with respect to the Housing Clinic, and then turns to whether she has done so with respect to the WLC election.

### 1. *Housing Clinic*

#### a. <u>Sexual Harassment</u>

Title VII of the Civil Rights Act of 1964 prohibits sexual harassment. 42 U.S.C. §

---

[14] Leyva also suggests the Honor Court proceedings were brought against her because of gender-based animus, but fails to provide any facts to support this contention. *Id.*, ¶¶ 69–75.

2000e *et seq.*; *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65–66 (1986).[15] Courts recognize two general categories of sexual harassment: *quid pro quo* harassment and hostile work environment—or here, hostile educational environment—harassment. *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007). Leyva does not suggest Dykstra explicitly or implicitly conditioned the bestowal of a benefit or the withholding of a detriment upon her acceptance of sexual conduct. Thus, Leyva's Amended Complaint does not allege harassment under a *quid pro quo* theory.

However, as explained above with respect to her Title IX claim, the Court finds Leyva's Amended Complaint adequately alleges a hostile educational environment harassment claim with respect to Dykstra's conduct. Specifically, Leyva has alleged: (1) she was subjected to verbal and physical conduct of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or persuasive to alter the conditions of her education and create an abusive educational environment; (4) the educational environment was subjectively and objectively abusive; and (5) the conduct was extreme enough to amount to a change in the terms and conditions of her education. Dkt. 7, ¶¶ 12, 14–16, 76–86, 108, 111–112; *Craig*, 496 F.3d at 1055. Leyva's IHRA hostile educational environment harassment claim may accordingly proceed with respect to her allegations regarding Dykstra.

---

[15] As the Court previously explained, because the IHRA mirrors the language of Title VII, it is appropriate to rely on cases interpreting Title VII to guide interpretation of the IHRA. Dkt. 4, at 15 (citing *Johnson v. N. Idaho Coll.*, 278 P.3d 928, 933 (Idaho 2012) and *Mendez v. Univ. Health Servs. Boise State Univ.*, 409 P.3d 817, 822 (Idaho 2017)).

b. Retaliation

However, as in its Initial Review Order, the Court again finds the allegations in Leyva's Amended Complaint are insufficient to state a retaliation claim under the IHRA. A retaliation claim consists of a plaintiff engaging in a protected activity, experiencing an adverse educational action, and demonstrating a causal relationship between the adverse action and the plaintiff's activity. Dkt. 4, at 17 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) and *Patterson v. Dep't of Health & Welfare*, 256 P.3d 718, 726 (Idaho 2011)).

The Court again assumes Leyva engaged in a protected activity when she reported her concerns about discrimination in the Housing Clinic. Dkt. 4, at 19; Dkt. 7, at ¶¶ 86, 109. In *Johnson*, 278 P.3d at 937–38, the Idaho Supreme Court also suggested the lowering of a grade may constitute an adverse educational action. Yet, even assuming Leyva has adequately alleged the first two elements of her IHRA retaliation claim, the Court remains unable to reasonably infer from Leyva's Amended Complaint that there was a causal relationship between her report of discrimination in the Housing Clinic and the B+ she received in the course. While Leyva conclusively states her B+ in the Housing Clinic "was the product of retaliation for her reporting of concerns about discrimination in the Housing Clinic," she does not identify any facts to support this contention. Dkt. 7, ¶¶ 76–87, 109. In addition, Leyva seemingly contradictorily maintains that Dykstra lowered her grade in the Housing Clinic in retaliation for disagreeing with his decision to cut ties with Jesse Tree. *Id.*, ¶ 86. In short, Leyva's Amended Complaint again fails to state a IHRA retaliation claim with respect to the Housing Clinic.

2. *WLC Election*

a. <u>Racial Discrimination</u>

As explained above with respect to Title VI, the Court finds Leyva's Amended Complaint plausibly alleges an IHRA racial discrimination claim with respect to the WLC election. *See* Section IV(B)(2). Most notably, Leyva's Amended Complaint alleges that while she followed the procedure taught to her and utilized by her white predecessors, the WLC election she administered as the first Latina president of the WLC was overturned—for the first time in the Law School's history—at the behest of white students and by white faculty, some of whom had racially discriminated against her in the past. Such faculty not only allowed Leyva to be mocked and humiliated by the white complaining students, but also purportedly assisted such students in taking over some of Leyva's duties as WLC president, reversing the election, and subjecting Leyva to disciplinary proceedings—all for following the process such faculty admitted was the custom and practice of her white predecessors. Dkt. 7, ¶¶ 38–47, 56–59, 66–71, 105–108. Leyva has thus plausibly alleged she was racially discriminated against, and her IHRA claim may proceed with respect to her allegations regarding the WLC election.

b. <u>Retaliation</u>

Leyva also alleges the Law School engaged in retaliation under the IHRA and Title VII of the Civil Rights Act by delaying the processing and resolution of her appeal of Samuels' decision to overturn the WLC election. Dkt. 7, ¶ 109. Specifically, the Law School took over a month—after OCRI issued its decision—to deny Leyva's appeal. *Id.*, ¶¶ 60, 65. As explained in its Initial Review Order, the Court cannot classify this delay as an adverse

educational action. Dkt. 4, at 19. In *Hatheway v. Bd. of Regents of Univ. of Idaho*, the Idaho Supreme Court held adverse employment actions under the IHRA "include significant changes in employment status" like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 310 P.3d 315, 325 (2013) (cleaned up). The *Hatheway* court also explained "mere inconveniences," such as ostracism in the workplace or simply being "kept out of the loop" did not constitute adverse employment actions. *Id.*

The significant changes identified in *Hatheway* fundamentally alter both a persons' standing in their organization and the benefits they receive from that organization. The delay here had no such effect. Although Leyva was understandably distressed by the length of time it took the Law School to review her appeal, this delay did not affect Leyva's grades or her degree. Apart from her frustration with having to wait for the Law School's decision, Leyva's Amended Complaint does not identify *any* adverse changes in her status or benefits as a student resulting from the delay. As such, Leyva has failed to plausibly allege the delay in resolving her appeal constituted an adverse educational action.

Further, even if the Law School's delay in resolving Leyva's appeal *was* an adverse educational action, Leyva has not identified any facts to suggest the delay in resolving her appeal was causally related to her report of discrimination. *See generally*, Dkt. 7. Leyva's retaliation claim with respect to the WLC election thus again fails.

## V. CONCLUSION

Leyva may proceed with her claims as outlined above. This Order does not guarantee that any of Leyva's claims will be successful. Rather, this Order finds certain

aspects of Leyva's Title IX, Title VI, and IHRA claims are colorable, meaning such claims will not be summarily dismissed at this stage of the proceedings. Ultimately, while this Order is not a final or comprehensive analysis of Leyva's claims, it is a determination that Leyva's Title IX, Title VI, and IHRA claims—as narrowed above and specified below—survive the initial review process required under 28 U.S.C. 1915(e)(2).

## VI. ORDER

**IT IS HEREBY ORDERED**:

1. Leyva may proceed on her Title IX claim with respect to the Housing Clinic. Leyva's Title IX claim with respect to the WLC election is DISMISSED.

2. Leyva may proceed on her Title VI claim with respect to the WLC election. Leyva's Title VI claim with respect to the Housing Clinic is DISMISSED.

3. Leyva may proceed on her IHRA claim with respect to her Housing Clinic allegations and with respect to the Law School's alleged racial discrimination during the WLC election dispute. Leyva's claims of retaliation in violation of the IHRA—with respect to both the Housing Clinic and the WLC election—are DISMISSED.

4. If Leyva wishes to again attempt to amend, she must file a Second Amended Complaint on or before September 22, 2025. If she does so, the Court must conduct a successive review of Leyva's Second Amended Complaint before she may proceed.

5. In the absence of a Second Amended Complaint filed on or before September 22, 2025, the narrowed claims outlined above will be deemed the operative

claims in this suit, and the Court will serve Leyva's Amended Complaint.

DATED: August 21, 2025

David C. Nye
Chief U.S. District Court Judge